IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | |
|---|---|
| LORIE DePERALTA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 11-1102-CV-SJ-ODS |
| ) | |
| DLORAH, INC. d/b/a NATIONAL ) | |
| AMERICAN UNIVERSITY, ) | |
| ) | |
| Defendant. ) | |

ORDER AND OPINION GRANTING
DEFENDFANT'S MOTION FOR SUMMARY JUDGMENT

I. BACKGROUND[1]

A. General

Defendant is a South Dakota corporation engaged in the business of providing higher education classes and degree programs for profit at various locations around the United States. Plaintiff is a Missouri citizen who enrolled in Defendant's Paralegal Studies program in May 2005. Plaintiff completed the enrollment process, and executed a promissory note, at Defendant's location in the Zona Rosa shopping center in Missouri. Defendant's initial "home campus" was at Zona Rosa, but in Fall 2006 she switched her home campus to Overland Park, Kansas. Plaintiff withdrew from the program in May 2007, by which time she had completed twelve classes: five in Missouri,

---

[1]The parties substantially agree on the material facts, so citations to the Record are supplied only where there is disagreement. Both sides present facts that are not material to the legal issues involved or have interjected arguments about the facts; consistent with the standard for summary judgment motions the Court has not detailed all of them. Consistent with the standard for summary judgment motions, all facts are stated in the light most favorable to Plaintiff.

one online, and six in Kansas. Had she not withdrawn, Plaintiff would have completed the degree program by the end of 2007. After withdrawing, Plaintiff enrolled in a similar program at Johnson County Community College ("JCCC") and obtained a certificate in paralegal studies from JCCC in December 2008. While enrolled at JCCC Plaintiff was working as a legal secretary at a law firm in Johnson County, Kansas, and was promoted to a paralegal position in June 2008 (before she actually received her certificate from JCCC). Plaintiff left that position in 2011 because she became pregnant and the hours were no longer compatible. Plaintiff obtained a new job with the City of Kansas City, Missouri, earning more than what she earned as a paralegal at the law firm.

## B. ABA Certification

The American Bar Association ("ABA") will certify paralegal education programs, but an educational institution is not required to obtain certification before bestowing paralegal degrees. Defendant's program in the Kansas City area was not certified. Plaintiff was aware the Kansas City program was not certified and asked about the subject during the enrollment process. Plaintiff spoke with Lindsey Kuxhausen, an admissions representative, who (according to Plaintiff) stated Defendant was "actively seeking ABA approval and that it would be achieved by the time I graduated." Plaintiff's Dep. I at 46, see also Plaintiff's Dep. I at 55. Plaintiff understood the ultimate decision about whether certification would be granted was to be made by the ABA, but Plaintiff understood Kuxhausen's statements to mean (1) Defendant was going to or had applied and (2) certification was going to happen, and (3) if a problem arose, she would be informed. Plaintiff's Dep. I at 53-54. Chuck Wolfe, then the director of Defendant's Kansas City-area paralegal program, told Plaintiff Defendant was "on the path for ABA approval" and discussed the benefits of ABA certification. Plaintiff's Dep. I at 84.

In truth, an application was never submitted to the ABA. Plaintiff's Request for Admission Nos. 40-42. However, the Record establishes (and Plaintiff does not

2

dispute)[2] Defendant was seeking ABA certification at the time the statements were made to Plaintiff.

### C. Internship Opportunities

After enrolling, Plaintiff learned that one of the requirements for completing the paralegal program was participation in an internship. In April 2007 Plaintiff contacted Wolfe about the internship requirement, and Wolfe responded the following day with answers to her questions. In that response, Wolfe also sought information to enable him to help Plaintiff obtain an internship. Plaintiff did not respond to Wolfe's e-mail because she had already decided to withdraw from NAU.

### D. Transfer of Credits

During her deposition, Plaintiff testified at some point in time – but after she enrolled and was taking classes – Wolfe discussed the transferability of credits from NAU.[3] Plaintiff described Wolfe's statements as indicating an agreement with JCCC about transferability of credits had just been finalized, but did not specify the particulars of that agreement. Plaintiff's Dep. I at 170-71. In a separate conversation, an instructor (Deborah Benton) indicated the agreement allowed for the transfer of credits "both ways," but Plaintiff does not recall the specifics of Benton's statement. Plaintiff's Dep. I at 171-72. The parties agree that an agreement between JCCC and Defendant existed.

As stated earlier, Plaintiff transferred to JCCC in the summer of 2007. JCCC operates on a semester system, and Defendant operates on a quarter system.

---

[2] Paul Sedlacek's testimony does not contradict the many other portions of the Record demonstrating Defendant was taking steps toward applying for certification. In context, Sedlacek testimony was that the final decision about certification rested with the ABA.

[3] The Court rejects Defendant's insinuation that Wolfe did not specify in which direction credits would transfer. A statement to current students discussing transferability of credits granted by the school conveys the idea that they will transfer *from* the institution *to* another institution. The context of the statements described by Plaintiff reinforces this conclusion.

Because Defendant's classes were of shorter duration, JCCC would grant only 2/3 credit for each credit earned at NAU.  JCCC also required students to take eighteen hours of "legal specialty courses," which was either not required by Defendant or was something Plaintiff had not done while enrolled at NAU.  More than 29 credits transferred, but the Record does not clearly state how many more credits were needed for Plaintiff to complete JCCC's program.

### E.  Other Misrepresentations

Before enrolling, Plaintiff was not told some classes would have to be taken at different locations or online.  She also was not told that all classes would be offered at the Zona Rosa campus.  However, Defendant's undergraduate catalog states the school may change class schedules, and programs,

Plaintiff asked where she could buy books, and Kuxhausen referred her to Defendant's bookstore.  Kuxhausen did not tell Plaintiff she could buy books elsewhere, but she also did not tell Plaintiff she was required to buy books from Defendant's bookstore.  Plaintiff's Dep. I at 189-90.  Patrice Robinson, a receptionist, "prompted" Plaintiff to get books at the bookstore and "inquired" if she had done so.  Plaintiff's Dep. I at 190.  A financial aid advisor "referred to my tuition and books as a lump sum, and that all I needed to do was go down to the bookstore and pick up my books when classes started."  Plaintiff's Dep. I at 96.  Plaintiff further testified that "most often" students did not know what books were required until just before class started, making it difficult if not impossible to buy books elsewhere.

### F.  Omissions Regarding Loan Defaults

Plaintiff alleges Defendant failed to disclose that a "significant" number of students had defaulted on their federal loans, and this fact was material to her decision to enroll.  However, in her deposition she could not specify a number that constituted "significant," did not know what the default rate was and did not know what an acceptable default rate would be.  Plaintiff knew it that "at least some" students

4

defaulted, but did not ask anyone what the loan default rate was for Defendant's students. Finally, the Department of Education maintains information about student loan default rates for institutions of higher learning on a publicly available website; Defendant's student loan default rates for the relevant time period were within a range considered acceptable by the Department of Education.

### G. Omissions Regarding Financial Incentives for Admission Representatives

Plaintiff alleges she was not told that the admissions representatives were commissioned or otherwise received benefits based on the number of students enrolled. In fact, she was not told anything about compensation for admissions representatives.

### H. Omissions Regarding Employment Statistics

Plaintiff alleges Defendant failed to disclose the most recent employment statistics or divulge that "many" paralegal graduates failed to obtain employment after completing Defendant's paralegal program. Despite knowing that not all graduates are successful in finding jobs in their field, Plaintiff did not ask for any information related to placement results for Defendant's graduates and did not know what an acceptable rate would have been. Defendant's paralegal program in the Kansas City area was relatively new, and at the time of Plaintiff's enrollment only one student had graduated with an associate's degree in paralegal studies.

## II. DISCUSSION

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See generally Williams v. City of St. Louis, 783 F.2d 114, 115 (8th Cir. 1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and

which facts are irrelevant that governs." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Wierman v. Casey's Gen. Stores, 638 F.3d 984, 993 (8th Cir. 2011) (quotation omitted). In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588-89 (1986); Tyler v. Harper, 744 F.2d 653, 655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985). However, a party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of the . . . pleadings, but . . . by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

The Amended Complaint asserts the following claims:

| | |
|---|---|
| Count I | Fraudulent Misrepresentation |
| Count II | Fraudulent Concealment/Omission |
| Count III | Violation of the Missouri Merchandising Practices Act |
| Count IV | A request for injunctive relief as permitted by the Missouri Merchandising Practices Act |
| Count V | Breach of Contract |
| Count VI | Negligence |
| Count VII | Negligence Per Se |

Both parties address the claims in an order different from the order they are presented in the First Amended Complaint. In fact, their briefs address the issues in an order different from each other. The Court's Order will follow the sequence employed in Defendant's Suggestions in Support.

### A. Breach of Contract

Count V alleges the Application for Admission combined with Defendant's acceptance of that application constituted a contract, and further alleges Defendant breached that contract by failing to provide adequate materials and instruction and

6

failing to provide the curriculum promised. Amended Complaint, ¶ 69. Defendant argues (1) there is no contract, and (2) even if there is a contract, there was no breach. In response to Defendant's arguments, Plaintiff has abandoned the breaches alleged in Count V of her Amended Complaint and argues Defendant breached the contract because "it was reasonably expected that NAU would submit an application to [the] ABA for approval of its paralegal program" and Defendant's failure to do so violated the covenant of good faith and fair dealing. Plaintiff's Suggestions in Opposition at 67. This argument fails for three reasons. First, this is not the theory pleaded in Count V. Second, there is nothing in the documents forming the posited contract (the Application for Admission or Defendant's responsive letter) related to ABA certification. Plaintiff relies upon the covenant of good faith and fair dealing to "import" or create a contractual obligation, but this asks too much of the doctrine. The covenant of good faith and fair dealing considers the parties' expectations when evaluating the propriety of a discretionary decision specifically contemplated by the contract. E.g., City of St. Joseph v. Lake Contrary Sewer Dist., 251 S.W.3d 362, 369-70 (Mo. Ct. App. 2008). The covenant of good faith and fair dealing cannot be relied upon to overcome the parol evidence rule and add terms to a contract that do not exist, or to address topics upon which the written contract is completely silent. "The law does not allow the implied covenant of good faith and fair dealing to be an everflowing cornucopia of wished-for legal duties; indeed, the covenant cannot give rise to new obligations not otherwise contained in a contract's express terms." Comprehensive Care Corp. v. RehabCare Corp., 98 F.3d 1063, 1066 (8th Cir. 1996) (applying Missouri law). Finally (and most importantly) the uncontroverted facts demonstrate Defendant was pursuing ABA certification, so any provision requiring Defendant to pursue certification would not have been breached. Plaintiff's unilateral belief that she would be notified if those efforts proved unsuccessful was not written into, or otherwise part of, the contract she posits. Defendant is entitled to summary judgment on Count V.

## B. Fraudulent Misrepresentation

Count I asserts a claim for fraudulent misrepresentation. The Court construes Count VI as asserting a claim for negligent misrepresentation. Fraudulent misrepresentation requires proof of the following:

1. A material representation that is false
2. The speaker's knowledge of its falsity or ignorance of its truth
3. The speaker's intent that the statement should be relied upon
4. The hearer's ignorance of the representation's falsity
5. The hearer's reliance on the misrepresentation
6. The hearer's right to rely on the misrepresentation
7. Consequent and proximate injury.

Renaissance Leasing, LLC v. Vermeer Mfg. Co., 322 S.W.3d 112, 131-32 (Mo. 2010) (en banc). Negligent misrepresentation contains similar elements, with the notable difference being that the speaker need not know the statement is false, but need only fail to exercise reasonable care in making the statement. Id. at 134. As relevant to this case, both fraudulent misrepresentation and negligent misrepresentation require proof that a false statement was made.

Plaintiff posits a variety of statements she alleges support her claims for fraudulent and negligent misrepresentation. Part of the difficulty in considering her claims is that neither party has been particularly specific about what was actually said. The parties describe the statements, and Plaintiff further describes how she interpreted statements, but the Record often does not conclusively establish exactly what was said. Given that this is a motion for summary judgment, the Court must construe the alleged statements in Plaintiff's favor – but even when this is done, the statements will not support her misrepresentation claims.

### 1. ABA Accreditation

Plaintiff alleges the statement that Defendant was seeking ABA approval was false. The uncontroverted facts demonstrate that the statement was true when it was made: Defendant intended to seek ABA certification, and Wolfe was working on this effort. Plaintiff contends that Defendant could not be "in the process" of seeking certification if it had not actually filed an application with the ABA, but this is an improperly narrow interpretation of the phrase. The fact that a formal application was never made does not transform the prior statements about Defendant's actions and plans into false statements.

### 2. Internship Assistance

Defendant argues that no false statement was made regarding internship assistance. Plaintiff was told she would receive assistance, but never responded to requests for information so she could receive that assistance. Plaintiff does not identify the allegedly false statement made in connection with the internship requirement, and the Court is unable to divine one for her.

### 3. Credit Transfers

Defendant's statements about transferring were true: credits from Defendant's paralegal program would transfer to JCCC. Nobody said they would transfer one-for-one; Wolfe told Plaintiff there was an agreement in place and this was true. Wolfe did not purport to itemize the agreement's details, and Plaintiff knew that the agreement would dictate the terms of any credit transfers. Plaintiff's claim fails for the lack of a false statement.

9

### *4. Books*

Plaintiff's claim about the availability of books for purchase also is not actionable. She alleges she asked where she could buy books. She alleges she was told she could buy them at the school's bookstore. She does not allege she was told she was required to buy them at the school's bookstore, nor does she allege she was told she could not buy them elsewhere. Defendant's statement was true: Plaintiff could buy the books she needed at the school's bookstore. Plaintiff's misinterpretation of accurate information does not render the statements false. Defendant was not required to tell Plaintiff all the other places in the world where she could purchase books. Plaintiff's factual contention that she was not provided a book list in time to permit her to buy books elsewhere does not render Defendant's statements false or otherwise constitute fraud.

### *5. Location of Classes*

Plaintiff's theory regarding the location of classes is unclear. Plaintiff does not claim she was told that all classes would be taught at Zona Rosa, nor does she claim that classes would never be available only at other campuses. To the contrary, the only statement on this issue appears in the catalog, which advised Plaintiff that class locations were subject to change. The record reflects that no false statement was made.[4]

### C. Concealment/Omission[5]

---

[4]To the extent Plaintiff posits these facts to support a claim of fraudulent omission, the claim fails. Assuming the fact was material and would have affected Plaintiff's decision to enroll, the catalog advised Plaintiff of the possibility that classes might be available only at certain campuses.

[5]The Court's discussion should not be construed as expressing an opinion on any of the parties' other arguments, including their arguments regarding the statute of limitations.

The elements for fraud by concealment or omission are similar to those for fraudulent misrepresentation. The difference is that the element of a false representation is replaced by (1) concealment of a material fact and (2) a duty to disclose. "A duty to disclose exists where there is a relationship of trust and confidence between the parties or where one party has superior knowledge or information of a material fact that is not within the fair and reasonable reach of the other party. Information is not within the fair and reasonable reach of a party if it is not discoverable by due diligence." White v. Bowman, 304 S.W.3d 141, 149 (Mo. Ct. App. 2009). "Superior knowledge, alone, is not always sufficient." Andes v. Albano, 853 S.W.2d 936, 943 (Mo. 1993) (en banc). Either a fiduciary or other special relationship is required, or the omission must exist in circumstances "where matters are not what they appear to be and the true state of affairs is not discoverable by ordinary diligence." Ringstreet Northcrest, Inc. v. Bisanz, 890 S.W.2d 713, 720 (Mo. Ct. App. 1995) (citing Bayne v. Jenkins, 593 S.W.2d 519, 529 (Mo. 1980) (en banc)). A fact is material if "if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so. The test of materiality is objective and not subjective." Grosseoehme v. Cordell, 904 S.W.2d 392, 397 (Mo. Ct. App. 1995) (internal citations omitted); see also Joel Bianco Kawasaki Plus v. Meramec Valley Bank, 81 S.W.3d 528, 538 (Mo. 2002) (en banc).[6]

### 1. Compensation for Admissions and Other Personnel

Plaintiff alleges she was not told that the number of students enrolled played a part in compensating admissions and other personnel. While the Court does not agree that all of the items identified constitute "compensation," (e.g., celebratory lunches and the bestowing of certificates), the Court agrees that the Record – construed in the light

---

[6]The parties dispute whether Kansas recognizes a cause of action for "negligent concealment," but the Court discerns no need to resolve the issue. The only difference between "fraudulent concealment" and "negligent concealment" is whether the defendant acts intentionally. Plaintiff's concealment claims fail for unrelated reasons, so it does not matter if negligent concealment is a viable cause of action.

11

most favorable to Plaintiff – demonstrates that recruitment or enrollment rates were a factor in determining raises and other compensation-related decisions.

The Court holds this fact is not material as a matter of law. All people who work are compensated. More specifically, all people who work in the admission department at institutions of higher learning – both for-profit and not-for-profit institutions – are compensated. All individuals – including admissions personnel – are presumably rewarded when the enterprise is successful, and are presumably subject to repercussions if they do a poor job. A reasonable person would not ordinarily attach importance to the details of the compensation formulas for the agent with whom he or she transacts, and the same holds true in this context. It may be that as a matter of public policy various statutes or regulations limit the nature of an admission representative's compensation. This does not transform the subject into one that is material and thus must be disclosed. To hold otherwise would require every enterprise to disclose the manner and details of its agents' compensation.

### 2. Loan Default Rates and Job Placement Rates

Plaintiff asserts Defendant did not disclose the loan default rate for its students. The Court discerns no duty to disclose such information. The uncontroverted facts demonstrate the loan default rate for Defendant's students was within the "normal" range, and Plaintiff proffers no legal requirement that Defendant disclose such information. Second, the information was available from the Department of Education's website, so Plaintiff could have discovered the information through reasonable diligence if she wanted to. Finally, there is nothing in the Record to suggest the information was material or that Plaintiff relied on an incorrect understanding of the facts in deciding to enroll. Plaintiff admitted that she knew some students defaulted, but she did not inquire about the issue or otherwise indicate the information was important to her decision – and learning that Defendant's students' default rate was "normal" would not have affected her decision.

Plaintiff also asserts Defendant did not disclose the job placement rates for graduates from the paralegal program. As with loan default rates, Plaintiff knew that not

all students graduating from an educational program find work in their chosen field, but failing to inquire about the matter demonstrates a lack of materiality and reliance.

### D. Missouri Merchandising Practices Act

The Missouri Merchandising Practices Act ("MMPA") prohibits the use of "any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri . . . ." Mo. Rev. Stat. § 407.020.1. "Merchandise" includes services. Id. § 407.010(4). A private right of action is bestowed upon any consumer who "suffers an ascertainable loss of money or property . . . as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020 . . . ." Id. § 407.025.1.

To the extent Counts III and IV are premised on claims of fraud, misrepresentation, or omissions, the claims fail for the same reasons discussed in Parts II.B and II.C, above. Plaintiff also argues Defendant engaged in "unfair practices" as prohibited by section 407.020 by paying admissions representatives in a manner that violates regulations promulgated by the United States Department of Education ("DOE"). Defendant does not respond to this argument. The question becomes, then, whether Defendant's violation of the DOE's regulations constitutes an unfair practice within the meaning of the MMPA.

The MMPA "supplement[s] the definitions of common law fraud in an attempt to preserve fundamental honesty, fair play and right dealings in public transactions." Huch v. Charter Communications, Inc., 290 S.W.3d 721, 724 (Mo. 2009) (en banc) (quoting State ex rel. Danforth v. Independence Dodge, Inc., 494 S.W.2d 362, 368 (Mo. 1973) (en banc)). The phrase "unfair practices" is not defined by the MMPA, and the Missouri Supreme Court directs this was a purposeful decision designed to prevent evasion of the statute. "This leaves to the court in each particular instance the determination whether fair dealing has been violated." Id. (quoting State ex rel. Webster v. Areaco Inv. Co., 756 S.W.2d 633, 635 (Mo. Ct. App. 1988)). Although the statute does not

define "unfair practices," the MMPA empowers the Missouri Attorney General to issue regulations interpreting the MMPA. Two regulations are relevant in the present case. The first is 15 C.S.R. 60-8.020(1), which states as follows:

> An unfair practice is any practice which –
>
>   (A) Either –
>
>     1. Offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or
>
>     2. Is unethical, oppressive or unscrupulous; and
>
>   (B) Presents a risk of, or causes, substantial injury to consumers.

The second regulation is 15 C.S.R. 60-8.090(1), which declares:

> It is an unfair practice for any person in connection with the advertisement or sale of merchandise to engage in any method, use or practice which–
>
>   (A) Violates state or federal law intended to protect the public; and
>
>   (B) Presents a risk of, or causes substantial injury to consumers.

The Court will accept, as it must, that Defendant's compensation policies violate the DOE's regulations. The Court also accepts that the regulations are intended to protect the public or espouse public policy; the fact that they are not promulgated by the Federal Trade Commission is of no consequence (either because the regulation does not limit the MMPA, the DOE regulations are promulgated pursuant to a federal statute, or because of 15 C.S.R. 60-8-090(1)). See Breeden v. Hueser, 273 S.W.3d 1, 8-10 (Mo. Ct. App. 2008) (permitting claim that violation of Food, Drug and Cosmetic Act and attendant regulations can be unfair practice under MMPA); Lefaivre v. KV Pharmaceutical Co., 636 F.3d 935 (8th Cir. 2011) (same). Nonetheless, Plaintiff's claim fails as a matter of law for two related reasons. First, the alleged unfair practice was not committed "in connection with" the sale or advertisement of educational

14

services.  Second, Plaintiff was not injured by Defendant's violation of the DOE's regulations.

The MMPA qualifies the prohibition on unfair practices by requiring proof that the unfair practice occurred "in connection with" the sale or advertisement of merchandise. The Record reveals no facts that could lead a jury to find a connection between the unfair practice and the sale or advertisement of merchandise.  Defendant's pay practices did not affect the merchandise sold, the advertisements or other communications about the merchandise, or the terms of the sale.  Permitting Plaintiff's claim would give her a roving commission to ferret out violations of law and seek damages, regardless of how attenuated those violations are to her transaction.  For instance, suppose Defendant violated federal tax laws, or violated laws regarding the payment of overtime to its workers, or violated OSHA regulations.  These violations could be characterized as violations of public policy, but none have anything to do with the transaction in question.

It is also not enough that the DOE's regulations could be described as intended for protection of the public.  Such an intent does not increase the connection between the alleged violation and Plaintiff's transaction with Defendant.  There must be a "relationship [between] the alleged unfair practice or deception to the initial sale or advertisement of the merchandise, as is required by the plain language of the" MMPA. State ex rel. Koster v. Portfolio Recovery Associates, LLC, 351 S.W.3d 661, 667 (Mo. Ct. App. 2011).  The common thread binding cases involving unfair practice claims is that the unfair practice have a relationship to the transaction at issue.  When that connection is absent, the claim is not allowed.  Absent a "'relationship in fact' between the advertisement or sale of the merchandise and the deceptive practices" alleged by Plaintiff, the claim fails as a matter of law.  Portfolio Recovery Associates, 351 S.W.3d at 668.

The second, and related, reason Plaintiff's claim fails is that the Record demonstrates she was not damaged by the unfair practice.  She was not damaged, largely because she cannot demonstrate any connection between the unfair practice and her transaction.  Plaintiff was not deprived of material information, the merchandise

15

was not affected, and she cannot demonstrate that the manner in which Defendant paid admissions personnel affected her transaction.

### B. Negligence Per Se

Count VII asserts a claim for negligence per se. Specifically, Plaintiff alleges Defendant had a statutory/regulatory duty to refrain from making false or deceptive statements or concealing material facts. Amended Complaint, ¶ 81. Plaintiff further alleges Defendant was subject to various other state and federal statutes and regulations. Amended Complaint, ¶ 82. Plaintiff then alleges Defendant violated the statutes and regulations "by making false, deceptive, erroneous or misleading statements to Plaintiff, and/or by omitting or concealing information or making statements that cannot be verified by Defendant." Amended Complaint, ¶ 83.

Count VII provides nothing that other claims in this case do not. Just as with the other claims, in order to succeed on this claim Plaintiff will have to demonstrate Defendant made material misrepresentations or omissions. The other claims are predicated on common law and Count VII is predicated on a variety of statutes and regulations, but the governing legal principles are the same. As stated earlier, the Record establishes that Defendant did not make any misrepresentations and did not conceal any material facts.

### III. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment (Doc. # 95) is granted.

IT IS SO ORDERED.

                          /s/ Ortrie D. Smith
                          ORTRIE D. SMITH, SENIOR JUDGE
DATE: September 17, 2012     UNITED STATES DISTRICT COURT